IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MILLARD GUTTER COMPANY, a corporation d/b/a MILLARD ROOFING AND GUTTER; GILLICK ENTERPRISES, INC.; and GROSS POINT HOLDINGS, LLC, | **8:18CV23** |
| Plaintiffs, | |
| vs. | **MEMORANDUM AND ORDER REGARDING THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT** |
| NATIONWIDE INSURANCE, a/k/a or d/b/a NATIONWIDE, and DEPOSITORS INSURANCE COMPANY, | |
| Defendants. | |

This case arising from an insurance claim for hail damage to the roof of a commercial building is before the Court on cross-motions for summary judgment. The first such motion is Plaintiffs' Motion for Partial Summary Judgment on the claim of liability for repairs and replacements undertaken by the Plaintiffs and the payment of the contractor's unpaid charges for such repairs. Filing 69. The second motion is Defendants' Motion for Summary Judgment on Plaintiffs' claims of breach of contract and bad faith. Filing 72. For the reasons stated below, Plaintiffs' Motion is denied, and Defendants' Motion is granted in part and denied in part.

## I.  INTRODUCTION

The factual background and the procedural background here are not comprehensive. Indeed, the Court's ability to set out either a comprehensive factual background or a coherent nucleus of the operative facts with key disputes has been hampered by both Plaintiffs and Defendants. Plaintiffs' Motion fails to comply with the version of NECivR 56.1 that has been in effect since December 1, 2022. However, some of Plaintiffs' failure to respond properly to Defendants' statement of facts is attributable to Defendants' greatly muddying the waters by

1

submitting a 35-page statement of undisputed facts in 250 numbered paragraphs that is unnecessary and out of proportion to the issues raised by the case and including what Plaintiffs correctly describe as "distortions" of record testimony and assertions of legal positions as "facts." Furthermore, Defendants' responses to Plaintiffs' statements of fact are often lengthy, repetitive, and non-responsive to the facts stated. The parties' insistence on talking past each other and mischaracterizing evidence has undermined the prompt and economical resolution of this lawsuit. The parties would do well to keep that in mind as trial approaches.

### A. Factual Background

Notwithstanding the parties' unhelpful conduct, the Court has attempted to glean from their submissions the essential factual context for the present motions. That essential factual background is much the same as the factual background set out in the Court's recent Memorandum and Order Regarding the Parties' Motions in Limine. Filing 108 at 2–3. As in that ruling, some facts for context were drawn from undisputed allegations in Plaintiffs' Complaint. Filing 1-3 (removed Complaint); Filing 8 (answer). Other disputed and undisputed facts are drawn from the parties' statements of facts in support of their Motions for Summary Judgment.

At relevant times, plaintiffs Gillick Enterprises, Inc., (Gillick) and Gross Point Holdings, LLC, (Gross Point) were named insureds on a policy for property located in Omaha, Nebraska, issued under the name of defendant Depositors Insurance Company (Depositors). Filing 91 at 1 (¶ 1).[1] Plaintiffs allege that Gillick and Gross Point assigned all their right to proceeds under any and all applicable insurance policies to plaintiff Millard Gutter Company (Millard). Filing 1-3 at 5 (¶ 12). Millard is a contractor doing business in Douglas and Sarpy Counties in Nebraska. Filing 1-3 at 2 (¶ 1). The Court will refer to Plaintiffs collectively as "Millard."

---

[1] Filing 91 is Defendants' Responses to Plaintiffs' Statement of "Undisputed Material Facts," but it sets out both Plaintiffs' stated facts and Defendants' responses, paragraph-by-paragraph.

Defendant Depositors is an affiliate of defendant Nationwide Insurance (Nationwide). Filing 8 at 2 (¶ 6). Gillick and Gross Point submitted a claim for storm damage to its commercial building during the covered period, which was accepted by Depositors and Nationwide. Filing 91 at 2 (¶ 2). Nationwide and its agents and employees have been involved in the adjustment of a claimed loss associated with that claim. Filing 1-3 at 3–4 (¶ 4). The Court will refer to Defendants collectively as "the Insurers."

The insured property has three buildings on it: a "Refrigeration Building," a "Truck Wash," and a "Main Building." Filing 76 at 2 (¶ 5). Millard clarifies that the "Main Building" comprises 98% of the structures on the property, with the "Refrigeration Building" attached to the "Main Building," and the "Truck Wash" resembling a shack. Filing 93 at 5 (¶ 1). The parties agree that the "Main Building" on the insured property has an "EPDM style" roof, consisting of a rubber membrane over polyisocyanurate rigid foam (ISO board), and a top layer of river rock ballast. *See, e.g.*, Filing 77 at 2 (describing the components of an EPDM style roof); Filing 74 at 3 (noting that the EPDM roof has an EPDM membrane and ISO board underneath). The parties' central dispute is the extent of hail damage and repairs required to the roof of the Main Building. Millard contends that "it became apparent that it was not possible to perform those repairs [authorized by the Insurers] without removal and replacement of the roof assembly, irrespective of whether or not particular areas of the roof had suffered direct physical loss." Filing 70 at 2. In contrast, the Insurers dispute that "there was any hail caused damage to the main building necessitating the complete replacement of the main building's roof." Filing 75 at 1.

More specifically, the Insurers assert (or admit) that the scope of work and pricing in an estimate prepared for Depositors by Young & Associates—described in this and the Court's previous ruling as the "Weber Estimate," Filing 87-2—identifies the adjusted and paid work for

repair to involved structures at the property. Filing 91 at 2 (¶ 3). To put it another way, the Insurers assert that the Weber Estimate establishes the repairs they are required to cover. Filing 91 at 3 (¶ 5). The Weber Estimate is based on reports of various consultants hired by the Insurers. Filing 91 at 2 (¶ 2). Millard asserts that the Weber Estimate did not include approval for replacement of the EPDM roof on the Main Building and that Weber indicated he was not allowed to include costs to replace the ballast roof in his estimate. Filing 91 at 2 (¶ 4). Millard contends that in order to make the repairs authorized in the Weber Estimate, it was necessary to remove ballast rock and cut into the EPDM roof of the building, which would necessitate replacement of the entire roof. Filing 91 at 3–4 (¶¶ 6–7). Millard alleges that the Insurers never addressed its claim that the work authorized under the Weber Estimate would trigger the need to replace the roof because making the authorized repairs would create consequential physical damage. Filing 91 at 21 (¶ 21). The Insurers respond that the Weber Estimate did not include adjustment for replacement of the EPDM style rubber membrane roof on the Main Building because that roof did not sustain any covered loss due to a covered cause of loss and that the Weber Estimate addresses the proper repairs. Filing 91 at 2–4 (¶¶ 4–7, 21).

### B. Procedural Background

Millard originally filed this action in the District Court of Sarpy County, Nebraska, but the Insurers removed it to this Court. Filing 1. In the removed Complaint, Millard asserts that the Insurers breached their contractual obligations under the applicable insurance policy by failing to pay the fair and reasonable costs to perform repairs of covered losses. *See, e.g.*, Filing 1-3 at 7 (¶ 30). Millard also asserts that the Insurers breached their obligations of good faith and fair dealing by causing arbitrary and capricious delays and by withholding repair approval without reasonable basis. Filing 1-3 at 9 (¶ 40). The Insurers deny Millard's claims and asserts various affirmative defenses. Filing 8. Trial in this matter is set to begin on August 8, 2023. Filing 56.

4

Whether this case proceeds to trial as scheduled depends on the disposition of the cross-motions for summary judgment now before the Court. The Court will summarize the applicable standards for summary judgment then consider the parties' Motions in turn.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, whether or not a court should grant summary judgment often turns on whether or not genuine issues of material fact are apparent on the record. In that context, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), reh'g denied, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the . . . absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652

(8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019). "The Supreme Court's 'repeated' admonition is that 'the [claimant], to survive the [opposing party's] [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor.'" Doe by next friend *Rothert v. Chapman*, 30 F.4th 766, 772 (8th Cir. 2022) (quoting *Anderson*, 477 U.S. at 257).

With these standards in mind, the Court turns to consideration of the parties' Motions.

### III. MILLARD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The first motion now before the Court is Millard's Motion for Partial Summary Judgment, which seeks to narrow the issues for trial. Filing 69. As mentioned at the beginning of this Order, Millard seeks partial summary judgment on the claim of liability for repairs and replacements undertaken by Millard and the payment of the contractor's unpaid charges for such repairs. Filing 69 at 1. Thus, Millard argues that the Insurers breached the insurance contract. Filing 70 at 6; *see also* Filing 1-3 at 7 (¶ 30) (setting out the breach of contract claim).

### A. The Parties' Arguments

Millard's argument for partial summary judgment is in essence that the Insurers issued the Weber Estimate setting forth repairs that they acknowledged were necessary with the price for such repairs, based on reports by their various consultants, and that the Insurers thereafter stuck to the Weber Estimate as establishing the limits of their obligations without regard to any other information. Filing 70 at 2. Millard contends that after examining the Weber Estimate and attempting to make the repairs that the Weber Estimate authorized, "it became apparent that it was not possible to perform those repairs without removal and replacement of the roof assembly, irrespective of whether or not particular areas of the roof had suffered direct physical loss." Filing 70 at 2. Millard argues that 210 Neb. Admin. Code, Ch. 60, § 010(A) obligates the Insurers to

cover the ensuing loss from consequential damage incurred in making required repairs. Filing 70 at 7. Millard contends that when it attempted to explain that authorized repairs would cause consequential damage requiring replacement of the roof, the Insurers ignored that explanation and refused even to come back to the site to examine the repair or replacement issues. Filing 70 at 8.

The Insurers' response is that Millard has created a "new" position concerning the necessity of replacing the roof that was not disclosed in any expert opinions and that was not disclosed at all until 2023. Filing 90 at 4. The Insurers assert that the repairs as adjusted and set forth in the Weber Estimate can be made on the Main Building and payment has been made for those repairs. Filing 90 at 7. The Insurers also argue that Millard's reliance on the standards in Title 210 is misplaced, because there is no private cause of action to enforce those standards. Filing 90 at 8. Next, the Insurers argue that provisions of the insurance policy in question excuse them from making any inspections, such as the inspection of repairability issues that Millard demanded, and also excuse the Insurers from giving Millard notice of the status of the investigation after litigation has commenced. Filing 90 at 10. Ultimately, the Insurers argue that they are not obligated to make any payments on a replacement cost basis because the repairs or replacement were not actually made or were not made as soon as reasonably possible where Millard simply tore off and replaced the roof. Filing 90 at 10–11.

In reply, Millard attempts to counter each of the Insurers' contentions and argues that there are no genuine issues of material fact precluding partial summary judgment in Millard's favor. *See generally* Filing 106. The Court finds it unnecessary to summarize those arguments because the extent to which they succeed is addressed below.

### B.  Legal Analysis

1. *The Insurance Regulation Is Relevant to Millard's Claims not the Basis for a Separate Claim*

The Court will consider first the impact of Nebraska Department of Insurance regulation 210 Neb. Admin. Code, Ch. 60, § 010.01(A). Millard argues that this provision obligates the Insurers to cover the ensuing loss from consequential damage incurred in making required repairs to the roof, namely, complete replacement of the roof. Filing 70 at 7. The Insurers argue that there is no private cause of action under the Nebraska Unfair Insurance Claims Settlement Practices Act from which that regulation arises, so Millard is not entitled to summary judgment on claims premised on violation of that regulation. Filing 90 at 8.

The regulation in question provides as follows:

> 010.01(A) When a loss requires repair or replacement of an item or part, any consequential physical damage incurred in making such repair or replacement not otherwise excluded by the policy, shall be included in the loss. Repair or replacement of consequential physical damage which requires the use of materials which are better or superior to the damaged materials shall not be considered betterment unless the use of such materials is at the request of the insured.

210 Neb. Admin. Code Ch. 60, § 010.01(A). As another judge in this jurisdiction explained in a similar case, the Insurers' assertion that Millard's cause of action for bad faith is based on alleged violations of Nebraska's Unfair Insurance Claims Settlement Practices Act and regulations pursuant to it and that the statute and regulations do not allow for a private right of action "is half-right." *J.L.'s Plaza 93, LLC v. Capitol Specialty Ins. Corp.*, No. 8:19-CV-184, 2019 WL 8063274, at *2 (D. Neb. Oct. 3, 2019).

The Court explained in *J.L.'s Plaza 93*,

> [T]he Unfair Insurance Claims Settlement Practices Act creates an administrative remedy to be enforced by the Director of the Department of Insurance. The Nebraska Unicameral did not intend for the Act to function as a private remedy. *See McShane Constr. Co., LLC v. Gotham Ins.*, 867 F.3d 923, 928 (8th Cir. 2017).

But the inquiry does not end there. Violation of a statute or regulation, although not negligence per se, may be evidence of negligence, or breach of a duty, which may then be considered with all the other evidence in a case. *Scheele v. Rains*, 874 N.W.2d 867, 872 (Neb. 2016); *Grade v. BNSF Ry. Co.*, 676 F.3d 680, 687 (8th Cir. 2012). Statutes and regulations may represent a consensus view of what a reasonable person would do under the circumstances, and may be helpful to a fact finder in deciding whether a standard of care has been breached. *See Norman v. Ogallala Public School Dist.*, 609 N.W.2d 338, 347 (Neb. 2000) (addressing safety standards).

*J.L.'s Plaza 93, LLC*, 2019 WL 8063274, at *2.

Here, as in *J.L.'s Plaza 93*, Millard is not asserting a private cause of action based on a violation of § 010.01(A). Rather, the reasonable inference to be drawn from Millard's reference to the regulation is that the regulation establishes "parallel duties" that are already imposed on an insurer under the common law for insurers to deal fairly and in good faith with an insured claimant such as Millard. *See id.* at *3 (citing *Millard Gutter Co. v. State Farm Fire and Casualty Co.*, 8:15-CV-406, 2016 WL 6102325, at *3 (D. Neb. April 8, 2016)). The plain terms of this regulation, understood as a consensus view, is that when a hail loss requires repair or replacement of an item or part, such as the gutters on the EPDM style roof of the Main Building, any consequential physical damage incurred in making such repair or replacement not otherwise excluded by the policy—such as complete replacement of the EPDM style roof—shall be included in the loss. 210 Neb. Admin. Code Ch. 60, § 010.01(A). The Insurers have not pointed to any provision of the policy that expressly excludes coverage for such consequential damage and ensuing loss.

Thus, contrary to the Insurers' contentions, Millard's reliance on § 010.01(A) is not an attempt to assert an unauthorized private cause of action, so reliance on that regulation does not defeat Millard's Motion for Partial Summary Judgment. On the other hand, contrary to Millard's contentions, the regulation does not warrant summary judgment as a matter of law in Millard's favor on its bad faith claim. Rather, it shows only that a reasonable juror might return a verdict in the Insurers' favor—or Millard's favor—on that claim because it may be helpful to a factfinder in

9

deciding whether the "good faith" standard of care has been breached. *See J.L.'s Plaza 93, LLC,* 2019 WL 8063274, at \*2 (explaining the effect of a regulation); *see also Chapman,* 30 F.4th at 772 ("[T]he [claimant], to survive the [opposing party's] [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor." (internal quotation marks and citation omitted)).

2.   *The Claim for Ensuing Loss Is Not "New" and Millard Has Supporting Expert Testimony*

The Insurers argue that Millard is not entitled to summary judgment because Millard has created a "new" position concerning the necessity of replacing the roof as consequential damage from authorized repairs resulting in ensuing loss that was not disclosed in any expert opinions and that was not disclosed at all until 2023. Filing 90 at 4. Millard argues this position is not "new," Filing 106 at 7, nor does it require "expert" testimony or "expert" disclosures. Filing 106 at 11.

The Court notes first that Millard's contention on the need for expert testimony is different from the position it took in its Motion In Limine seeking to exclude *inter alia* "any testimony or evidence, including from any of Defendants' purported experts . . . as to the repairability of the roof at Gillick Enterprises, including but not limited to any repairability issues related to the repairs approved by the Defendants." *See* Filing 73 at 1; Filing 74 at 1. Millard argued that such evidence should be precluded because the Insurers had made no timely expert disclosures on this issue. Filing 74 at 4–5. In its Memorandum and Order Regarding the Parties' Motions in Limine, the Court observed that "[a] layperson juror is highly unlikely to understand . . . what evidence is relevant to the question of the repairability of the roof in question, including repairability issues arising from repairs approved by [the Insurers]," so that this issue required an expert disclosure. Filing 108 at 7. The Court declined to exclude the evidence at that time only because the Insurers had not yet attempted to use any undisclosed expert testimony on that issue in support of a motion

10

or at trial. Filing 108 at 8 (citing Federal Rule of Civil Procedure 37(c)). Thus, the Court declines to consider whether Millard has lay opinion testimony, such as testimony from Mr. Eggers, that generates a genuine issues of material fact on this issue, because the issue requires expert testimony.

The Court concludes that summary judgment in Millard's favor is not precluded on the basis that Millard's ensuing loss claim is "new" or on the basis that the claim is not supported by "expert" testimony. As Millard points out, its expert, Carl Martin, explained in his deposition in September of 2019 that replacement of the gutter, gravel stop, curb flashing, and the flashing on the parapet wall on the roof of the Main Building would require invasion of and work on the EPDM roof system. Filing 107-5 at 2–3 (Martin Depo. at 253:12–254:12). Mr. Martin testified further that there would be problems with the interface and cohesion of new EPDM with existing EPDM. Filing 107-5 at 3 (Martin Depo. at 254:20–256:12). Millard also points to correspondence from counsel dated November 12, 2019, following an attempt to mediate the dispute in which counsel expressly noted, "What is absent from the insurance company's scope of work, however, is any consideration for the consequential damage that will be necessitated by the removal of the damaged one-piece gutter system." Filing 107-1 at 28. That correspondence reiterates, "What is missing from the adjustment is corresponding replacement of the EPDM roof assembly that is a consequential part of replacing the one-piece gutter system." Filing 107-1 at 28. Millard has identified other correspondence from counsel in a similar vein from late 2019 through September 2020. Filing 106 at 7.

Thus, Millard gave notice of the purportedly "new" ensuing loss claim and has supported it with expert testimony. Millard's Motion for Summary Judgment is not precluded on this ground,

but neither is it clear that Millard is entitled to summary judgment on the ensuing loss claim, as explained below.

### 3.  *Fact Issues Preclude Summary Judgment on the Claim for Ensuing Loss*

Although Millard's ensuing loss claim is not "new," Millard is not entitled to summary judgment on that claim because there are genuine issues of material fact on it. Genuine issues of material fact as to whether repairs authorized in the Weber Estimate would cause such consequential physical damage and ensuing loss for which the Insurers had a duty to pay arise from conflicts in the parties' evidence. Millard's evidence includes Mr. Martin's testimony identifying the consequential damage he believed would follow from making the repairs authorized by the Insurers. The Insurers' evidence includes evidence from its various experts suggesting that repairs to the EPDM roof were possible, even though those reports antedate Millard squarely raising the issue of whether the repairs authorized by the Insurers would require replacement of the EPDM roof. A reasonable jury could conclude from the Insurers' expert reports that repairs could be made without completely replacing the EPDM roof, Mr. Martin's expert opinion notwithstanding. *See Chapman*, 30 F.4th at 772 ("[T]he [claimant], to survive the [opposing party's] [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor." (internal quotation marks and citation omitted)).

Furthermore, a reasonable jury could conclude that the Insurers adequately investigated the possibility of consequential damages from making authorized repairs, despite their refusal to inspect the premises at Millard's repeated invitation. *Id.* The Insurers are correct that the policy in question states in part, "We are not obligated to make any inspections, surveys, reports or recommendations." Filing 82-2 at 32 (D.2.). Although an excuse from "inspections" is not an excuse from "investigation," the Insurers' various expert consultants' reports generate genuine issues of material fact as to what repairs were required, even though those consultants' reports

were prepared well before Millard discovered evidence that the authorized repairs could not be made without causing consequential damages.

### 4. Other Issues of Fact also Preclude Summary Judgment in Millard's Favor

The Court turns to the Insurers' final basis for precluding summary judgment in favor of Millard. The Insurers contend that they are not obligated to make any payments on a replacement cost basis because the repairs or replacement were not actually made or were not made as soon as reasonably possible, where Millard eventually simply tore off and replaced the roof. Filing 90 at 10–11. The Insurers point to a provision of the policy stating the following:

> We will not pay on a replacement cost basis for any loss or damages:
>
> > (1) Until the loss or damaged property is actually repaired or replaced; and
> >
> > (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

Filing 82-1 at 55 (§ G.3.d.). What defeats Millard's Motion for Partial Summary Judgment is not the Insurers' invocation of this provision but the Court's conclusion that there are genuine issues of material fact as to whether, in light of the evidence already discussed, the Insurers' own conduct delayed any repairs. Perhaps among others, there are genuine issues of material fact as to whether the Insurers delayed repairs while their various expert consultants examined the roof. There are also genuine issues of material fact as to whether the Insurers' conduct delayed repairs by disputing ensuing loss from consequential damage for authorized repairs. Also, there are genuine issues of material fact as to whether the Insurers' conduct delayed any complete replacement of the roof if that was actually the appropriate repair. Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

5. *Summary*

After consideration of the parties' arguments and the record evidence, the Court concludes that Millard is not entitled to summary judgment on Millard's breach of contract claim of liability for repairs and replacements undertaken by Millard and the payment of the contractor's unpaid charges for such repairs.

## IV.  THE INSURERS' MOTION FOR SUMMARY JUDGMENT

The second motion now before the Court is the Insurers' Motion for Summary Judgment on Millard's claims for breach of contract and bad faith. Filing 72. Unlike Millard's Motion, the Insurers' Motion seeks to obviate the need for trial entirely.

### A.  Claims Concerning the Truck Wash and the Refrigeration Building

The first issue the Court will consider is one expressly pointed out by the Insurers in their Reply Brief in support of their Motion for Summary Judgment. The Insurers point out that in response to the Insurers' Motion, Millard has failed to dispute that the Insurers made proper adjustment of and payment for the claims related to the Truck Wash and the Refrigeration Building. *See* Filing 102 at 1 (the Insurers' Reply Brief); *see generally* Filing 93 (Millard's Opposition). The Court agrees that Millard failed to carry its burden to oppose summary judgment as to claims related to those buildings. *See* Fed. R. Civ. P. 56(c)(1) (stating that the party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the . . . absence of a genuine dispute."). Therefore, the Insurers' Motion is granted to the extent that summary judgment is entered in the Insurers' favor on any claims related to the Truck Wash and the Refrigeration Building.

The remaining claims relate to the replacement of the EPDM roof on the Main Building. In their Motion for Summary Judgment, the Insurers assert that there are no genuine issues of

material fact and that they are entitled to summary judgment as to six matters that defeat Millard's claims. *See* Filing 72 at 1–2; *see also* Filing 75 at 1–2) (reiterating the six grounds). The Court will consider those six matters in turn to the extent the Court finds them dispositive. The first matter concerns Nationwide's liability on any claim, while the other five concern the liability of both Depositors and Nationwide if the latter remains a defendant.

## B.  Nationwide's Liability on Millard's Claims

The Insurers contend first that Nationwide is entitled to summary judgment in its favor on Millard's claims for breach of contract and bad faith because Nationwide is not a party to the insurance contract upon which Millard's claims are based and Nationwide owes Millard no contractual duties that give rise to a bad faith claim. Filing 75 at 3. Millard contends Nationwide can be held liable for its involvement in adjusting the claim. Filing 93 at 9.

### 1.  *The Parties' Arguments*

The Insurers argue that only the parties to a contract can be liable for a claim of breach of contract and that there is no dispute that Depositors is the entity that issued the insurance policy in question here. Filing 75 at 4. Similarly, they argue that liability in tort for bad faith springs from the implied covenant of good faith and fair dealing in the policy, so a non-party to the underlying contract cannot be liable on that tort. Filing 75 at 4.

Millard does not dispute that Nationwide and Depositors are separate corporations or that only Depositors is a party to the insurance policy. Instead, Millard argues that a jury should decide whether Nationwide bears liability for bad faith conduct because Nationwide's employees were engaged in adjustment of the loss and Depositors is a subsidiary of and under the control of Nationwide. Filing 93 at 9. Indeed, Millard argues that the only employees ever identified as participating in this claim were adjusters who were held out as employees of Nationwide, the Insurers' consultants communicated with Nationwide, and the payments the Insurers made were

issued on Nationwide's account. Filing 93 at 9–10. In short, Millard contends that Nationwide has disregarded the corporate formalities and distinctions between it and Depositors. Filing 93 at 11.

In reply, the Insurers argue that Depositors was the corporate entity investigating and adjusting a claim made under its own policy and that Nationwide's employees participated in the investigation and adjustment of the claims as agents of Depositors pursuant to a contract between the two companies. Filing 102 at 5–6. The Insurers argue further that Millard has produced no evidence sufficient to demonstrate that Nationwide is an "alter ego" of Depositors, that there is sufficient evidence to "pierce the corporate veil," or that there is sufficient evidence to show that the corporate forms were disregarded to commit fraud. Filing 102 at 7–8.

### 2. Millard Has Not Generated a Fact Issue on Nationwide's Liability

Nationwide is correct that Depositors Insurance Company not Nationwide is identified as the insurer on the pertinent insurance policy. Filing 71-1 at 13.[2] Millard does not dispute that Nationwide and Depositors are at least nominally separate corporate entities. Nevertheless, Millard seeks to hold Nationwide liable for breach of the insurance policy and for bad faith failure to settle a claim under the policy.

As the Nebraska Supreme Court explained, albeit nearly five decades ago, "[T]he general rule is that a corporation will be looked upon as a separate legal entity until sufficient reason to the contrary appears." *Hayes v. Sanitary & Improvement Dist. No. 194*, 244 N.W.2d 505, 511 (Neb. 1976). It is not enough standing alone that one corporation is a subsidiary of another. *Global Credit Servs., Inc. v. AMISUB (Saint Joseph Hosp.), Inc.*, 508 N.W.2d 836, 843 (Neb. 1993). Rather, "[f]or [a claimant] to pierce the corporate veil of [a subsidiary corporation], it must show that [the

---

[2] The named insureds include plaintiffs Gillick Enterprises, Inc., and Gross Point Holdings, LLC, but not Millard. Filing 71-1 at 16. As explained above, Gillick and Gross Point assigned all the right to proceeds under any and all applicable insurance policies to plaintiff Millard, and the Court has referred to the Plaintiffs collectively as Millard for the sake of convenience.

corporate parent] totally dominated [the subsidiary] to such extent that [the subsidiary] had no separate corporate existence and functioned solely to achieve the purposes of the dominant corporation." *Id.* "[T]he doctrine of separate corporate existence does not break down merely because a corporation is a subsidiary, even if wholly owned by the parent," nor does it break down because the parent corporation stood behind the debt of the subsidiary. *Id.* at 842–43. Furthermore, "[t]o pierce the corporate veil between a parent and a subsidiary, a plaintiff must show more than the mere sharing of services between two corporations." *Bacon v. DBI/SALA*, 822 N.W.2d 14, 26 (Neb. 2012) (citing *Global Credit Servs., Inc.*, 508 N.W.2d at 842).

Millard has at most pointed to evidence suggesting that Nationwide wholly owns Depositors and that Nationwide and Depositors shared services. The parent-subsidiary relationship, even involving a wholly owned subsidiary, is not enough to pierce the corporate veil. *Global Credit Servs., Inc.*, 508 N.W.2d at 842–43. The Insurers have pointed to evidence that they share services pursuant to a contract between them. *See* Filing 103-2 (Holland Aff. at ¶¶ 2–3) (explaining that Depositors and Nationwide are "separate corporate entities," that Depositors' policies are "handled by employees of Nationwide Mutual Insurance Company, pursuant to a contract between the two companies," and that under that contract Nationwide's employees "act as agents" of Depositors). Sharing services also is not enough to pierce the corporate veil. *See Bacon*, 822 N.W.2d at 26. Millard has not presented sufficient evidence to raise so much as an inference that Nationwide "totally dominated" Depositors to such extent that Depositors "had no separate corporate existence and functioned solely to achieve the purposes of [Nationwide]." *Global Credit Servs., Inc.*, 508 N.W.2d at 843. Thus, no reasonable juror could find that piercing the corporate veil between Nationwide and Depositors is appropriate to make Nationwide liable on either of Millard's claims. *See Chapman*, 30 F.4th at 772 (explaining that to defeat summary

judgment the non-movant must point to evidence that a reasonable juror could find in the non-movant's favor).

Nationwide is entitled to summary judgment on both of Millard's claims against it.

## C.  The Claims Against Depositors

The conclusion just above leaves open the question of whether Depositors is entitled to summary judgment on either or both of Millard's claims against it. The Nebraska Supreme Court explained the differences between a breach of contract claim and a first-party bad faith claim as follows:

> We have explained that a cause of action for insurer bad faith is separate from, and not dependent on, a cause of action for breach of the insurance policy, although the two may share facts in common. The damages recoverable for bad faith differ too; because claims of bad faith are grounded in tort, traditional tort damages, including damages for mental distress and for economic loss, are recoverable when they are proximately caused by the insurer's tortious bad faith conduct. Indeed, one of the justifications for recognizing the intentional tort of bad faith was concern that recoverable damages for breach of the insurance contract are inadequate to compensate policyholders for personal injuries suffered as a result of an insurer's tortious bad faith.

*Millard Gutter Co.*, 980 N.W.2d at 432 (citations omitted); *see also Henriksen v. Gleason*, 643 N.W.2d 652, 657 (Neb. 2002) ("Contract actions, which arise from a breach of a duty imposed on one by an agreement, protect a plaintiff's interest in or right to performance of another's promises, whereas tort actions, which arise from a breach of a duty imposed by law, protect a plaintiff's interest or right to be free from another's conduct which causes damage or loss to the plaintiff's person or property."). Also, the bad faith claim relies on the implied covenant of good faith, *see Braesch*, 464 N.W.2d at 776, while the breach of contract claim is based on coverage terms of the policy.

This Court notes further that there is no mental state requirement for a breach of contract claim. *See Henricken*, 643 N.W.2d at 658 (explaining that elements of a breach of contract claim

are the existence of a promise, its breach or failure to perform a contractual duty, damage, and compliance with any conditions precedent that activate the defendant's duty). In contrast, first-party bad faith is an "intentional tort" that involves both an absence of a reasonable basis for denying benefits of the insurance policy and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Millard Gutter Co.*, 980 N.W.2d at 432. This difference underscores the independence of the claims and why one may be actionable even if the other one is not.

Because the two claims are "separate from, and not dependent on" each other, the Court will give the two claims separate consideration.

> 1.  *The Bad Faith Claim Against Depositors*
>
>> a.  The Parties' Arguments

Depositors argues that a first-party bad faith claim under Nebraska law is defeated if the insurer has a reasonable basis for fairly debating the claim. Filing 75 at 5. Depositors argues that the determination of whether a claim is fairly debatable is a matter of law for the court. Filing 75 at 5. Depositors then argues that it denied that there was any damage caused by hail to the EPDM rubber membrane, the facer material, or the ISO board based on the reports of its experts. Filing 75 at 6. This is a companion to its argument in resistance to Millard's Motion for Partial Summary Judgment that the repairs as adjusted and set forth in the Weber Estimate and based on reports of Depositors' experts can be made on the Main Building without replacing the entire roof. Filing 90 at 7. Depositors argues that because it has an arguable basis to deny the claim, based on its experts' reports, Millard's bad faith cause of action fails as a matter of law regardless of the manner in which an investigation was or was not conducted. Filing 75 at 6.

Millard counters that Depositors ignores that Millard told Depositors that repairs approved in the Weber Estimate launched a "cascading" or "domino" effect leading to the need to replace

the entire roof because old EPDM could not bond with new EPDM. Filing 93 at 12. Millard argues that Depositors staked out its position that the EPDM roof was not going to be considered even before the Weber Estimate was prepared. Filing 93 at 12.

In reply, Depositors argues that it had a reasonable basis for denying Millard's claim to replace the entire rubber EPDM membrane roof, because (a) it is uncontested that the rubber EPDM membrane roof sustained no hail caused damage of any type; and (b) the opinions of its experts informed Depositors that hail was not the cause of any damage to the ISO board under the ballast and rubber membrane. Filing 102 at 10.

### b.   Requirements to Prove First-Party Bad Faith

The Nebraska Supreme Court recognized the tort of first-party bad faith a little over three decades ago. *See Millard Gutter Co. v. Shelter Mut. Ins. Co.*, 980 N.W.2d 420, 431 (Neb. 2022) (citing *Braesch v. Union Ins. Co.*, 464 N.W.2d 769 (Neb. 1991), *disapproved on other grounds*, *Wortman v. Unger*, 578 N.W.2d 413 (Neb. 1998)). "[A] first-party bad faith cause of action is based upon allegations that the insurer, in bad faith, refuses to settle with its own policyholder insured, who thereby suffers some type of direct loss." *Id.* (quoting *Braesch*, 464 N.W.2d at 776). As the Nebraska Supreme Court has explained,

> To establish a claim of first-party bad faith, a policyholder must show both an absence of a reasonable basis for denying benefits of the insurance policy and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. Based on these elements, we have characterized first-party bad faith as an intentional tort, reasoning that [b]ad faith by definition cannot be unintentional.

*Millard Gutter Co.*, 980 N.W.2d at 432 (internal quotation marks and citations omitted). The Nebraska Supreme Court has further explained,

> [I]t must be determined whether, at the time of each denial, [the insurer] had an arguable basis on which to deny the claim and if the insurer had such a basis, [the insured's] bad faith cause of action fails as a matter of law regardless of the manner in which an investigation was or was not conducted. The question [w]hether a claim

20

is fairly debatable is appropriately decided by the court as a matter of law ... and such a determination is based on the information available to the insurance company at the time the demand is presented.

*LeRette v. Am. Med. Sec., Inc.*, 705 N.W.2d 41, 49–50 (Neb. 2005) (internal quotation marks and citations omitted). The available information includes the insurer's own experts' opinions, and the insurer is permitted to "rely in good faith on its own experts' opinions rather than the opinion of the insured's expert." *Id.* at 50.

    c.    Depositors Could Fairly Debate Millard's Claim Regarding the
          Main Building Roof

The Court concludes that as a matter of law based on the information available to Depositors at the time Millard made a claim regarding the Main Building roof that any direct hail damage to that roof was fairly debatable. *See LeRette*, 705 N.W.2d at 49–50 (explaining that this question is for the court). There was a dispute between the parties' experts on whether there was any direct hail damage to the Main Building roof. Millard argues that its expert Carl Martin has unequivocally opined that the Main building roof suffered direct damage from hailstones, including to the facer adhered to the iso-boards. Filing 93 at 17 (citing Filing 83-1 at 79:9–19 (Martin Depo.)). Mr. Martin's later affidavit also indicates that he observed hail damage to "metals present on the roof" sufficient to cause insulation facer crack formations and compression of insulation, Filing 95-1 at 14 (¶¶ 53–54), and that he observed from videos that there was hail damage to the facer of the iso-board and hail penetration into the iso-boards, Filing 95-1 at 25–26 (¶ 92. ¶ 95). On the other hand, Depositors points to the evidence of its experts' opinions that there was no hail damage to the EPDM rubber membrane roof, the facer material, or the iso-board insulation. Filing 75 at 6 (citing Filing 96-5 at 33–34 (Holland Depo. at 32:20–33:6)). Depositors was entitled to "rely in good faith on its own experts' opinions rather than the opinion of the

21

insured's expert" such that Depositors could fairly debate the claim for direct hail damage to the EPDM roof. *LeRette*, 705 N.W.2d at 50.

The Court also concludes that as a matter of law based on the information available to Depositors at the time Millard demanded payment for complete replacement of the Main Building roof that the need for complete replacement was fairly debatable. *See LeRette*, 705 N.W.2d at 49–50 (explaining that this question is for the court). Indeed, this is a consequence of conflicts in the parties' evidence on ensuing loss that defeated summary judgment in Millard's favor on its claim for repairs and replacement of the Main Building roof. Millard's evidence includes Mr. Martin's evidence discussed above in § III.B.2. and 3. identifying the consequential damage that Millard believed would follow from making the repairs authorized by the Insurers. Depositors' evidence includes evidence from its various experts suggesting that repairs to the EPDM roof were possible, *i.e.*, could be made without completely replacing that roof, even though those reports antedate Millard's communications squarely raising the issue of whether the repairs authorized by Depositors would require replacement of the EPDM roof. If a reasonable jury could conclude based on conflicting expert opinions that repairs could be made without completely replacing the EPDM roof—as the Court concluded above—it follows that as a matter of law Depositors was entitled to fairly debate the need for complete replacement of the Main Building roof based on its own experts' opinions. *LeRette*, 705 N.W.2d at 50 (explaining that an insurer is permitted to "rely in good faith on its own experts' opinions rather than the opinion of the insured's expert" to fairly debate a claim). In short, Depositors could fairly debate whether the EPDM roof required replacement and the claim for ensuing loss.

Because Depositors had a good faith basis to fairly debatable Millard's claim, Millard's bad faith cause of action fails as a matter of law "regardless of the manner in which an investigation

was or was not conducted." *LeRette*, 705 N.W.2d at 49–50. Thus, Millard's protestations about Depositors' failure to investigate its allegations that authorized repairs required replacement of the roof and coverage for the ensuing loss are irrelevant.

In short, Depositors is entitled to summary judgment on Millard first-party bad faith claim.

### 2. The Breach of Contract Claim Against Depositors

The Court turns to consideration of Millard's remaining claim against Depositors for breach of contract because summary judgment on the bad faith claim has no impact on the breach of contract claim. Depositors contends that there are four fatal impediments to Millard's breach of contract claims against it: (1) Millard failed to comply with duties in the event of loss, because Millard failed to cooperate and provide relevant material information, relieving Depositors of its obligations under the policy; (2) Millard failed to make any repairs as soon as reasonably possible after the loss or damage; (3) the policy provides that loss or damage will not be paid on a replacement cost basis other than the least of the amount actually spent that is necessary to repair or replace the lost or damaged property, and Depositors has already paid that amount; and (4) Millard cannot establish that the cause of factures to the facer material was due to a covered cause of loss. Filing 75 at 2 (summarizing grounds). The Court finds that there are genuine issues of material fact on each of these grounds for summary judgment on the breach of contract claim.

First, Depositors argues that it requested bills, receipts, invoices, and related documentation to substantiate the invoicing from Millard Gutter and to determine the amount actually spent that was necessary to repair or replace the damaged property, but Millard has not cooperated, as required by provisions (6) and (8) of the "Duties In The Event Of Loss Or Damage" section of the insurance policy. Filing 75 at 8 (citing Filing 82-1 at 51). Depositors cites *D & S Realty, Inc. v. Markel Ins. Co.*, 789 N.W.2d 1, 16–17 (Neb. 2010), for the proposition that an insurer may avoid liability if an insured fails to comply with a notice or cooperation provision. Filing 75 at 7. Millard

argues no such affirmative defense of failure to cooperate was pleaded in Depositors' Answer. Filing 93 at 2. Millard argues further that it has provided all the information necessary and that there is no obligation on a contractor for the insured to submit proprietary data as to its internal expenses or profitability, as Depositors has demanded. Filing 93 at 17. Millard also argues that such information is not only irrelevant but was never requested by Depositors during the claims process. Filing 93 at 18.

The Court finds first that even if Depositors was required to plead failure to cooperate as an affirmative defense, Depositors did so by pleading as an affirmative defense, "Nationwide and/or Depositors have no obligation to make payments to Plaintiffs for any claimed loss or damage, as Plaintiffs have failed to comply with the Depositors Policies." Filing 8 at 8 (¶ 49). The Court also finds that there are genuine issues of material fact as to whether Depositors requested the pertinent information during the claims adjustment process as opposed to during litigation and whether Millard (or more specifically, the named insureds) timely provided necessary information to fulfill the cooperation requirement under the policy.[3] A reasonable juror could find that the named insureds timely provided all necessary and relevant information and that additional information demanded by Depositors was not necessary or relevant. See *Chapman*, 30 F.4th at 772 ("[T]he [claimant], to survive the [opposing party's] [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor." (internal quotation marks and citation omitted)).

As to the contention that Millard failed to make any repairs as soon as reasonably possible after the loss or damage, Depositors argues that the policy requires that it will not pay on a

---

[3] The Court has considerable doubt that the information about Millard's own invoicing from its subcontractors and Millard's internal expenses that Depositors now asserts it must be given is relevant to the determination of "[t]he amount actually spent that is necessary to repair or replace the lost or damaged property" within the meaning of the "replacement cost basis" provision of the policy. *See* 82-1 at 56.

replacement cost basis "[u]nless the repairs or replacement are made as soon as reasonably possible after the loss or damage." Filing 75 at 10 (citing Filing 82-1 at 55). Depositors argues that the loss occurred on August 1, 2012, but no claim was made until July 8, 2015, and in the case of the Main Building roof, Millard had a bid for repairs in August of 2015, but then tore off and replaced the roof only years later. Filing 75 at 10–11. Millard points out that Depositors took two years to investigate the claim before finally releasing the Weber Estimate in November 2017, which was too late in the year for work to be done at that time. Filing 93 at 21. Millard attributes further delay to Depositors because Depositors failed to acknowledge ensuing loss from authorized repairs. Filing 93 at 21–22. Again, as mentioned above in relation to Millard's Motion for Summary Judgment, *see* § III.B.4., the record raises genuine issues of material fact as to which party's conduct caused what delays in the repairs and replacements, such that a reasonable juror could find that no delays sufficient to excuse Depositors' performance are attributable to Millard. *See Chapman*, 30 F.4th at 772 (stating this reasonable juror standard).

Next, Depositors contends that it has met the policy requirement to pay for loss or damage on a replacement cost basis for the least of the amount actually spent that is necessary to repair or replace the damaged property. Filing 75 at 11. Depositors argues that it has already issued payments of $736,531.95 on the claim on an actual cash value basis. Filing 75 at 12. Depositors argues that for Millard to obtain more on a replacement cost basis, Millard must provide information from Millard Gutter's own records to determine the amount of money actually spent that was necessary to repair or replace the damaged property, but Millard Gutter and the named insureds have refused to do so. Filing 75 at 12 (citing Filing 82-1 at 56). Among other responses, Millard argues that the amount "spent" by the named insured is shown in the invoices Gillick and Gross Point received from Millard. Filing 93 at 24. Millard points to decisions of several courts

25

indicating that the proper analysis looks at the amounts billed by the contractor to the insured not the contractor's own payments to subcontractors or for materials. Filing 93 at 24.

The Court finds that the amount "actually spent" by the named insureds in payment to Millard Gutter as the contractor is determinable from Millard Gutter's invoices to the named insureds. This is so, because the plain meaning of the amount "actually spent" for repairs or replacement in an insurance policy is the amount "actually spent" by the insureds, here Gillick and Gross Point, not the amount actually spent by the insureds' contractor. *See N. Star Mut. Ins. Co. v. Miller*, 977 N.W.2d 195, 202 (Neb. 2022) (explaining as to an insurance policy, as to any other contract, "[w]hen the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them"). Depositors' contrary interpretation is "a fanciful, curious, or hidden meaning" that the Court cannot adopt. *See id.* ("[W]hen interpreting the plain meaning of the terms of an insurance policy, we have repeatedly stated that the natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning."). Nevertheless, there are genuine issues of material fact as to whether the amounts "actually spent" were "necessary to repair or replace the lost or damaged property," Filing 82 at 56, where the "necessity" of replacement rather than repair of the Main Building roof is the central dispute between the parties. A reasonable juror could find in Millard's favor on that issue. *See Chapman*, 30 F.4th at 772 (stating this reasonable juror standard).

Finally, Depositors argues that Millard cannot establish the cause of factures to the facer material was due to a covered cause of loss. Filing 75 at 13. Again, Millard has presented sufficient evidence from its expert Carl Martin to generate genuine issues of material fact that the facer and insulation material were damaged directly by hail. Again, Mr. Martin has opined that the Main

building roof suffered direct damage from hailstones, including to the facer adhered to the iso-boards. *See* Filing 83-1 at 79:9–19 (Martin Depo.). Mr. Martin's later affidavit also indicates that he observed hail damage to "metals present on the roof" sufficient to cause insulation facer crack formations and compression of insulation, Filing 95-1 at 14 (¶¶ 53–54), and that he observed from videos that there was hail damage to the facer of the iso-board and hail penetration into the iso-boards, Filing 95-1 at 25–26 (¶ 92, ¶ 95). A reasonable juror could believe this testimony and thus find that there was damage to the facer material caused by hail damage covered by the policy. *See Chapman*, 30 F.4th at 772 (stating this reasonable juror standard).

Depositors is not entitled to summary judgment on Millard's breach of contract claim.

## V.  CONCLUSION

Upon the foregoing,

IT IS ORDERED that

1.      Plaintiffs' Motion for Partial Summary Judgment of liability on the breach of contract claim for repairs and replacements undertaken by the Plaintiffs and the payment of the contractor's unpaid charges for such repairs, Filing 69, is denied;

2.      Defendants' Motion for Summary Judgment, Filing 72, is granted in part and denied in part as follows:

a.      The Motion is granted as to Plaintiffs' claims against defendant Nationwide; and

b.      The Motion is granted as to Plaintiffs' first-party bad faith claim against defendant Depositors; but

c.      The Motion is denied as to Plaintiffs' breach of contract claim against defendant Depositors.

3.     This matter will proceed to trial only on Plaintiffs' claim of breach of contract against defendant Depositors.

Dated this 21st day of July, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge